May it please the Court, the question before the Court, when one looks at the entire District Court opinion in this case, is what could be stronger objective indicia of non-obviousness than the fact that the authors of virtually all of the pertinent prior art told us that we could not do what we accomplished doing, and in fact, had tried and failed themselves. Had the District Court conducted the appropriate legal analysis, rather than conducting a hindsight analysis coming to its opinion on obviousness and then and only then turning to the objective indicia, and shifting the burden to the plaintiff, had the District Court not done that, we would have had a different result. LESLIE KENDRICK Well, you've got a lot packed into the statement you just made. So, firstly, the District Court did go through a detailed analysis, did he not, of all of the prior art, detailing why, based on the expert testimony and based on the comments, including some of your testimony, that prior art did not carry the day in terms of demonstrating that it was some sort of impossible challenge. Am I wrong about that? I mean, that he did the analysis. You may disagree with this analysis, but he did the analysis. SUSAN CRAWFORD He did the analysis of the objective indicia only after coming to the conclusion that the claims were obvious. And then the analysis wasn't so much a critique of the objective indicia, he accepted that indeed it showed what it showed, but each time said that it was not enough to overcome the court's finding of obviousness. And what this court said less than two months ago in race psychobenzaprine is that that's not what you do. LESLIE KENDRICK Yeah, well, it depends on how you characterize what he did. I mean, he talked about that there's a prima facie case of obviousness that will be rebutted by a shifting of the burden, which could be a burden of production. Is it not true that many of our cases have employed the same analytical framework and that that's the same analytical framework that you advocated that the district court used in this case? SUSAN CRAWFORD I'll answer the – there's two questions in there. I'll answer the court's last question first, which is no, we did not advocate that analytical framework. What we advocated was and acknowledged that we had the burden of production as far as producing evidence of objective indicia, of non-obviousness. We never advocated that we had the burden of persuasion of demonstrating non-obviousness. And yet, if we look at what the district court said at the very end of the district court summary of its obviousness conclusion at A49, the district court says as follows, while some persons of ordinary skill in the art believed it would be challenging to develop a once-a-day Trostian formulation, the plaintiffs, meaning us, have not demonstrated that there was a widespread belief that the claimed invention was impossible or that the challenges of Trostian were insurmountable, such that development of the claimed invention was unexpected. In light of the foregoing, the court concludes that these arguments do not robust defendant – excuse me – premonstration case of obviousness. But why doesn't that mean simply that the court was looking at the evidence in terms of who bore the burden of production, not necessarily shifting the burden of persuasion? Because what the court says clearly here is that we were the ones to – it was our burden to demonstrate. That's persuasion rather than production. It was our burden to demonstrate that there was a widespread belief that the claimed invention was impossible or that the challenges of Trostian were insurmountable. First of all, we don't have the burden ever to show – But wait, I'm confused. What do you – are you challenging the burden stuff or are you challenging the standard he applied, which was insurmountable? Both, Your Honor. He made legal errors in both, shifted the burden to the plaintiffs to demonstrate non-obviousness, and then set that bar so high that it would, of course, be impossible to do, since clearly we can't demonstrate that the claimed invention was impossible. We succeeded. And clearly we can't demonstrate that the hurdles were insurmountable. We surmounted them. So – But the district court made clear, I think, in page A14 what the legal standard was, outlining the four factors under Graham and then stating a party seeking to challenge the validity based on obvious must demonstrate by clear and convincing evidence, et cetera, et cetera. There's, to me, that indicates that he was firmly aware of the fact that it was the defendant that bore the burden of persuasion. But – On all four factors. And yet, what the district court then said when the court got to the objective indicia of non-obviousness was to shift the burden. Despite what the district court said at page 14, when we get to pages 46, 47, 48, and 49, the burden has been shifted to the plaintiffs to demonstrate that there was non-obviousness. And what happened in this case is – unfortunately, it's difficult for a district court in an extended release case, because there is no doubt that the court is going to find in the prior art an immediate release version. The court is going to find in the prior art the technology to enable taking an immediate release molecule and putting it into an extended release format. That's all going to be there. And there's even the technology to release – have at least a part of it released in the colon. However, what all the prior art showed was that that would do you no good, because – What prior art are you speaking of specifically? Schroeder? What? Well, Schroeder – I mean, the district court went through each piece of prior art that you were discussing, I think. Tell me if I'm wrong. And he analyzed it, not concluding whether it was impossible or not impossible. He completely – he dismissed Schroeder for reasons that sound quite persuasive to me, including that your own expert, Dr. Davis, I think, acknowledged that Schroeder dealt with erectum, and it was only 2 percent, so it was not persuasive prior art, you know. Right? I mean, he went through this analysis of all that prior art. Actually, no, not correctly, Your Honor. And in fact, there were clearly erroneous findings by the court during that analysis. For example, the example Your Honor just gave regarding Dr. Davis. Here's what Dr. Davis actually said. He was asked – now, sir, and this is at A11492. The person of ordinary skill in the art would not look at Schroeder in 2002 and say, quote, I couldn't use the colon. True? Answer, the colon is awful. If they were perverse, oh, I've got to try and use the colon. This just confirms – and he's referring to the Schroeder poster – that the person skilled in the art would have expected from trospium, a quaternary ammonium compound. And let me just digress for one minute. No dispute that trospium is a quaternary ammonium compound. No dispute that means it's permanently positively charged. No dispute that as a result of that, colonic absorption is expected to be negligible. And no dispute that the Schroeder poster simply taught what one of the skilled in the art already knew, and that's what Dr. Davis said. He said, by that I mean the colon in this instance, because of the different properties of the colon. They would have predicted this sort of value, meaning the negligible colonic absorption. So they would have put this aside. They would have spent no more than one minute looking at it. This was taken out of context by both the district court and opposing counsel in trying to say to our expert, dismiss Schroeder. Now our expert simply said Schroeder would be put aside because it simply taught what everyone in skilled in the art knew. The quaternary ammonium compounds are not absorbed in the colon because of their permanent positive charge. What about the evidence that talked about trospium suppositories and the effectiveness of those suppositories in treating certain conditions? Interestingly, the suppositories were produced and manufactured and sold by Maddow, the very company who did the Schroeder poster. And by the way, another error by the district court was the district court dismissed the Schroeder poster as never having been peer-reviewed, but in fact it was published in a peer-reviewed journal, and that's at 84987. And reached the very same conclusions in the peer-reviewed journal that colonic absorption was negligible. Was there evidence that indicated that the trospium suppositories had some impact, suggesting that at least there is some absorption of trospium in the colon? Suggesting some, and certainly Schroeder suggested there was some. Evidence that was considered by the district court. The district court is obviously looking at all the evidence and weighing and balancing and coming to a conclusion. Indeed, but what the district court did was ignore the fact that that suppository art was by Maddow, the very company that said that what we did could not be done, and the very company that tried and failed itself. And that's where the district court dismissed Maddow based on a clearly erroneous assumption at page 846. Are you saying that the evidence of the use of trospium suppositories was incorrect? No, I'm not, Your Honor. I realize what you're saying about the fact that some of this came from Maddow, but are you saying that there's clear error in the conclusion about what this evidence actually showed? Yes, Your Honor, I am. And the reason I am is because the court found and dismissed all of the Maddow's work in this area where they tried and failed. Part of it, a lot of Maddow's evidence was hearsay, was it not? No, Your Honor. It was not being offered for the truth. What Maddow told us was it cannot be done. Obviously, that's not true. We did it. And so it's not hearsay. We did not offer it for the truth of the matter asserted. We offered it to show skepticism by others and the fact that Maddow said it could not be done and we overcame that skepticism and actually did it. More importantly, though, the district court found that Maddow never had a once-a-day program and therefore dismissed all of that objective indicia when that is clearly erroneous finding. If we look at the testimony of Dr. Sandage and the court for the proposition that Maddow never had a once-a-day program cited some testimony of Dr. Sandage but cited it out of context. If we look at the testimony of Dr. Sandage at A10-232 and 233, Dr. Sandage talks about how Maddow had a once-a-day program, how he met with Maddow on a regular basis on a once-a-day and I'm sorry, it's also at 10-155-158, met with them regularly on their once-a-day program and then if we turn to A8376, it's actually the meeting minutes where Dr. Savage is meeting with the gentleman from Maddow about their once-a-day program. The court found at A46 that Maddow didn't have a once-a-day program and therefore all this information about Maddow was irrelevant. That's a clearly erroneous factual finding by the court when the testimony was directly to the contrary, not just Dr. Sandage's but the supporting documentation which brings me back to Your Honor's question about the hearsay. Dr. Sandage indeed testified as to what he was told by Maddow and what he was told by Bayer but in addition to that, we have the contemporaneous documents of Maddow. We have the Schroeder poster. We have the peer-reviewed publication. We have the reports that Maddow sent to Endeavous at A5447 also coming to the same conclusion and we have the internal documents regarding Bayer's skepticism. They relied on Maddow and the fact that there was virtually no colonic absorption to say they weren't interested in partnering with us. Now again, this is contemporaneous documents, not something that experts are saying ten years later and what the court stressed in Recyclo-Benz Supreme and reiterated on May 30th in the Mintz case is that this objective indicia is the key to making sure a court doesn't perform a hindsight analysis. Before your time runs out, can I just ask you quickly what the current status of this case of the issue is here? They're not on the market yet, right? That's correct, Your Honor. Are they still before the FDA? I believe so, yes, and they would be able to tell you better what their FDA status is but I believe they have not yet obtained any authority to launch. Thank you, Ms. Brooks. Mr. Weiss? Yes, thank you, Your Honor. Do you really think you're going to divide time three ways? We'd like to try. And if you fail, it's not our failure. Absolutely. Please proceed. For 25 years we knew of trospium, we knew of multi-particulate formulations that are designed to target release in the GI tract. Twenty-five years it's not done. Where is there any analysis of the effect of that lengthy period of time on a showing of non-obviousness? The question, Your Honor, is what can we take from that failure? And we have to look at the state of the art... If it was so obvious, why did it take the brightest minds in the pharmaceutical world 30 years to do it? There's absolutely no evidence, Your Honor, that there was meaningful motivation or the good priority... What do you mean there's no motivation? You've got, for one thing, you've got side effects. If you're taking two pills a day, you're doubling the side effects. If you can cut the side effects by half, that's motivation. I didn't hear any discussion of that, by the way, in the record either. That, first of all, Your Honor, there's no halving of the side effects. The testimony, which was put on by Allegan to prove the reduced side effects... Was that in the record? It is, Your Honor. This is in the information. Where in the record do you guys discuss that if you double the dose, it isn't going to have some effect on side effects? No, that's not my point, Your Honor. If you double the dose of an immediate release, go from 20 to 40 or go from 40 to 80, of course you increase the side effects. So there is an automatic motivation to cut from two pills a day to one. That is not the way it goes, Your Honor. Not to mention the expense, time, and convenience factors which are so significant in the marketplace. Well, if I could come back to that, Your Honor. I appreciate that. You've got two questions. You've got a motivation question and you've got the 25-year question. Correct me if I'm wrong. Neither one of which the record answers in any sufficient way. Well, let me try to address. Try it. So, first of all, Graeme V. John Deere states that failure of others before the prior art is important. And we see Maddow failing among others, don't we? Well, but the prior art that we're looking at here is all from the 97 and later time frame. So, the formicokinetics of the immediate release formulation which were published. This is Fuchs and Zeres and Froehlich, 2000, 2000, 2002. Motivation, Ravner, the commercial changeover for oxybutynin and tolteridine. Oxybutynin was a three or four day, I'm sorry, three or four times a day product and tolteridine was twice a day. Changeover to those driving the commercial motivation, 2002. And the solution for the relatively poor absorption of traspium chloride and quaternary ammoniums in the colon, which is to increase the amount of liver there. Which a person of skill in the art would have understood to be nearly impossible, right? Absolutely not, Your Honor. Well, what do you make of this? I make. Ferrens Schroeder article where it says 2% absorption in the colon and hence colonic absorption is almost negligible. Well, first of all, Your Honor, Lange is... Published in other places so that it's peer-reviewed and dismissed kind of quickly by the district court. First of all, Your Honor, the poster was not peer-reviewed. There was a publication a couple of years later which postdates the filing, which is... Negligible, it says. Where is there any record that anyone of skill in the art would not have assumed the same thing? For 25 years, so they didn't do it. That is what the poster says, first of all. That's absolutely correct. But the question is, what would a person of ordinary skill in the art make of the poster? And would that poster demotivate or remove a reasonable expectation of success? There was other evidence, was there, not relating to the colonic absorption of trospium? Yes, there was evidence on both sides of this issue. There was this pository evidence which indicates, as conceded by the plaintiff's inventor, that that would be inconsistent with no colonic absorption. And then we have Mandaus and Dr. Sandage saying, no, it doesn't happen. As a matter of fact, they even take a license. We don't have Mandaus saying that doesn't happen. And what we have Mandaus doing is we have Mandaus acquiring rights to the dossier and the formulation. That's very valuable. There's no question that the clinical studies, the regulatory dossier, and all those things are very valuable things to have. That's the evidence we have here. We don't have evidence that Mandaus took a license back to a patent to practice something we wanted, nor do we have evidence that Mandaus, the company, was skeptical. And as to the truth of the matter asserted point, I agree that state of mind is a hearsay exception. So if a person says, I'm skeptical because I don't believe it can be done, that is that person's state of mind. That's not hearsay. And that was what was offered at trial for that purpose. How do you deal with the district court's clear shifting of the burden in the wrong direction? There was none. There was none, Your Honor. We just read the phrase right here, requiring them to… The plaintiffs have not demonstrated. Is it their burden to demonstrate? If not their burden, ultimately to… The burden always stays on you, right? Isn't that what we said in cyclobenzaprine? That's what the court has always said. Thank you. Of course, Your Honor, but that is not what happened here. The plaintiffs haven't demonstrated. The district court also stated a number of times that the plaintiffs had showed that the claims were prima facie obvious and then looked at the secondary considerations. And more to the point, Your Honor, the key secondary consideration here… But we don't do it that way outside in the infringement context. We don't do prima facie and then you've got to prove it the other way. The burden stays on you. The secondary considerations are part of the equation beginning to end. Of course. And we don't do them. Well, okay, they proved their side of the story. Now you've got to rebut it, and that's exactly the word they use. The key secondary consideration here, Your Honor, was the skepticism, was the alleged skepticism. That is not just the secondary consideration. That's the 25 years you've never dealt with. But, Your Honor, respectfully, I have dealt with that in the sense that the motivation and the prior art that we're relying on begins arising around the 97, 98, 2000 times. And it's just so implausible that no one would want to cut from two pills to one the first day. That's not correct, Your Honor. So two pills a day is not bad. So, for example, Robner says that oxybutynin, which is three or four times a day, has serious compliance problems. But then he says that tolteridine, which is twice a day, does not have compliance problems because of that. And Sanctora in Germany was a twice a day product. So, yes, going from twice a day to once a day is nice. Is it a commercial necessity? It's got to be an improvement. Got to reduce side effects. Yes. Got to improve convenience to the customer. Got to improve in every way if it's plausible. The point is nobody thought it was plausible, and so you didn't spend any time there until some people started to do it in other areas in the 1995 era. And then people started to look at it. Right, Your Honor. But looking at something and saying nobody did it. The motivation was always there. I don't agree with that, Your Honor. You know, you're just saying that nobody figured it out, that it was possible until later, and then you started to research it. Evidence that others started to research it more enthusiastically in the 1990s doesn't suggest that there wasn't a motivation for improvement earlier. That's not incorrect. But what we do have, Your Honor, is a difference between saying nobody did it, therefore it can't have been obvious. That's anticipation. Whenever we're talking about obvious, nobody actually did it before. Otherwise, this would be an anticipation case. And the fact that a company – we don't know what Madafs' commercial imperatives are. We don't know if this was a good drug for them. We don't know what the market was like in Germany. We don't know if they had the budget to do it. We don't know if they had switched to a different kind of formulation work in general. We just don't know. And Dr. Fuhr is really who we're talking about here. It's Madafs, Madafs, Madafs, but it's always Fuhr. Fuhr is not even a person of ordinary skill in the art. Dr. Fuhr is a physician. He's an MD. That's on page 9323 of the record. The person of ordinary skill in the art agreed to by both parties here and adopted by the district court at A1516 is a formulator with sustained release experience. That's not Fuhr. But at best, we'd have a case that's close to equipoise. The patent office, who examined all of the same information, granted this patent. You had to overcome it by clear and convincing evidence without improperly shifting the burden, and there are at least three things there that didn't happen. Well, again, Your Honor, the district court's analysis of skepticism, which was their key secondary consideration, was primarily addressed by us as the first three grand factors. Because what we have here is the argument based on Schroeder that a person of ordinary skill in the art would not have been motivated to do this. That was the argument in the PTO. That was what the examiner said in his statement of reasons for allowance, and that's Allergan's argument. We addressed that head on. That goes to motivation. That goes to reasonable expectation of success, and we addressed that. And the district court was satisfied that when one looks at all the evidence around Trospia, the good and the bad, although one would recognize that this is a drug that doesn't have good chronic absorption, that that is not a deal stopper, that there are ways in the art to deal with that. Ways were known for 25 years. That's not correct, Your Honor. Langis and Kynig published in 1997. They were not known for 25 years. You had multi-particulate formulations targeted at the GI tract far before that. Of course, Your Honor. You pick out these, but that was going on long before. That's the way you get extended release formulations, is to target GI tract. Sorry, Your Honor. Absolutely. But art that says overcome poor absorption of a quaternary ammonium in general and trospium chloride in particular by saturating the mucus, that's new in 97. Langis says that's new in 97. He says in that paper, this is a newly elucidated reason why this drug is poorly absorbed in the cold. There's no evidence that that was not true in Langis. Langis published this as a new finding, that the reason it was not well absorbed in the cold was because of this binding to mucus. And he made the observation in that, that that could be overcome by saturating the binding sites with an excess of quaternary ammonium. That's also what's in Kynig. Now, Kynig is not trospium chloride. But Kynig also says when you have poor colonic absorption, a way to deal with that is to dump excess drug in the colon to overcome that poor absorption. And that was not in the art before that. At least the district court was privileged to find, privileged is the wrong word, was permitted to find on the record. Thank you, Mr. Weiss. Thank you, Your Honor. Ms. Ward and Mr. Kramer have four minutes to divide between them. May it please the court. We are seeking affirmance of the district court's judgment in favor of PADEC on alternative grounds. Specifically, the district court's holding of infringement by PADEC is improper and should be reversed. We argue separately because PADEC's product is different from that of Watson and Sandoz, our co-defendants. Now, PADEC did not design its product with enteric coatings to delay release until the lower GI tract. So, with respect to PADEC, the basis of Allergan's infringement argument, as well as the finding of infringement by the district court, is Dr. Davis' model of generalized GI transit time superimposed on in vitro dissolution curves. Now, Dr. Davis simply takes general GI transit data from a textbook and then directly applies it to in vitro dissolution tests. So, we have to be clear what this model is. For example, he takes the general estimate of two and a half hours for a non-trosteum pellet to reach the ileum, which is defined in the Patent and Suit as the lower GI tract. And then he asks, what's happening in the dissolution beaker at two and a half hours? If there's any drug remaining in the dosage form, he says infringement. Now, Dr. Davis' model relies on exactly the same in vitro dissolution evidence that this court in ALSA said is insufficient to establish infringement of an in vivo release limitation. And the district court clearly erred in distinguishing ALSA. Now, in ALSA, this court held there's no link between how long and how much drug dissolves in a beaker, and how long and how much drug is released in the body. The same missing link also fatally infects Dr. Davis' model. He looks at how long and how much, and then he asks an additional question, which is, where is the dosage form at that point? The ALSA link must be made first, and as in ALSA, it is not credible that such a link exists. And that's particularly so in this case, because there's even additional evidence that shows there's no link. There's three key pieces of evidence. First, Dr. Davis admitted that his model failed to predict the site of release with respect to the XR1 pellets of the invention and the Shoje pellets of the prior art. Second, Dr. Davis failed to account for the trospium slowing effect of the GI tract. Would you like to save any time for Mr. Kramer? Yes, Your Honor, I would, actually. Thank you. Thank you. Kramer? Good morning, Your Honors. Just a couple points in the appendix I'd like to point to in response to what Ms. Brooks said in her argument. First, I would like to start with A4987 and 4992. Ms. Brooks said that the district court made a finding of fact that the Schroeder poster was not peer-reviewed, and that's Mr. Weiss noted that the poster was not peer-reviewed. By the time it becomes peer-reviewed, that is 4987 is the beginning of it. But 4992 is the conclusion that they reached there, and they back off of the claim in just the poster that there was no colonic absorption, and the conclusion is on 4992, in summary, trospium chloride is absorbed primarily in the upper GI tract. If this was so well-known then, why wasn't it done for 25 years? If it was just as common as you seem to think it is. Because the market pressures in 1999 and 2000, we've got Detrol and Ditropan. But we only do things when the market pressures us to do them, and by the way, the market had to have pressured throughout that 25 years. But assuming your argument, which is arguable at best, we only respond when the market requires us to. We only improve side effects. We only try to make our products better just when the market compels it. Not that that's not the only time that we do it, but the district judge in this particular case made a finding of fact that it was the market pressures, and he based that finding of fact from— Is it a mistake to say that the only time we improve pharmaceuticals is when the market compels it? We don't consider the comfort and convenience and side effects on our patients? Is it a mistake for the industry to do that, or is it a mistake that the district judge— No, that there would be motivations beyond the market. There's no doubt that there is, in general, a motivation always to go from once a day, from twice a day to once a day. But the only thing the district court seems to look at is the market, isn't it? No, he absolutely considered that. He recites in his opinion the testimony from Dr. Kitty that it had been known since the 1950s that there's a motivation to drop down doses. But just generally, if that were the case, every single extended release formulation would be non-obvious, and that's not the case here. We know so much about trospium, in particular, that for this particular drug— Why did the patent office do this, then? You're making it sound like they were—of course, they had all this information in front of them. They were just dumb, right? The patent office didn't have all of the information. They had the Schroeder poster. The Schroeder poster was presented to them as the prevailing sentiment in the art. It was not the prevailing sentiment. We had Dr. Mayerson and Dr. Kitty testify what their understanding of the art was. The district judge heard that testimony and credited it. He did not reach the same conclusion that the prevailing sentiment in the art would be demonstrated by the Schroeder poster. He had very specific reasons why he thought that the Schroeder poster did not teach away from the claimed invention, including the fact that it was just a mini enema. It was only given in the rectum. Testimony from Dr. Mayerson and Kitty is that you can—five milliliter mini enema in the rectum only is not indicative of colonic absorption, particularly when you find no information from the rectum. If you put five milliliters in the rectum and you find that the blood levels go up, that could be indicative of colonic absorption. But the opposite conclusion cannot be reached, that if you don't find any information from just the tiny portion of the rectum at the very, very, very end of the colon. They testified and the district judge heard and presumably credited that testimony, that that conclusion could not be reached from that. The other part in the record that I wanted to point out, 8376— I think your time has expired. Thank you. Thank you, Your Honor. Ms. Brooks, you have two minutes. Thank you, Alex. I'll speak very rapidly. First of all, I'd like to address the peer-reviewed paper that came from the poster and counsel comments that there was a backing off somehow. On that very same page, A4992, here's what they said. The prolonged release preparation of trospium chloride due to the fact it has such poor absorption is lost for therapeutic effect. So they did not change. As far as when this motivation took place, this is the testimony of defendant's expert, Dr. Kibbe, at A11070. Answer, when I'm asking, isn't it true that the motivation to take twice a day and turn it into a once a day has been around since the invention of twice a day? Answer, that motivation has been with us for a long time based on the benefits to the patient. And I can't say why—and then he says he can't say why Maddox didn't do it. And then I said, so right now we're talking about as of 1967, trospium chloride had been on the market twice a day. Yes, yes. And as of that time period, the motivation to take any once a day dosage and twice a day dosage and turn it into a once a day dosage was there, correct? Answer, in general, yes. So why wasn't it done, to answer your Honor's question? Dr. Derendorf, another one of their experts, answered it. It wasn't done because he said trospium is a very, very poorly absorbed drug and that if you take it without any modification, 90% of it is never going to get into the bloodstream. Dr. Kibbe, their expert, said trospium is very challenging, although not impossible. It's extremely difficult, although not insurmountable. Thayer relied on the—if we look at A8503— relied on the results of the Schroeder poster, relied on the results of the Schroeder paper to come to the conclusion that trospium XR is not a viable XR candidate. And they expressed that skepticism. So your Honor is absolutely correct. There is no answer for why 25 years went by. Other than the answers their own experts gave, which is trospium is virtually impossible to turn into an extended release. We did it. The fact we succeeded is now being held against us in the court's obviousness analysis. Thank you. Thank you, Ms. Brooks. That concludes our morning.